No. 22–16644

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**SHERIDA JOHNSON, ET AL.,**

Plaintiffs–Appellees,

v.

**NISSAN NORTH AMERICA, INC.**

Defendant–Appellant.

---

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:17–cv–00517–WHO
Honorable William H. Orrick

---

## NISSAN'S OPENING BRIEF

---

Amir Nassihi
Andrew L. Chang
M. Kevin Underhill
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Ste. 2300
San Francisco, CA 94105
Tel: 415.544.1900
Fax: 415.391.0281

Holly Pauling Smith
Christopher R. Wray
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108–2613
Tel: 816.474.6550
Fax: 816.421.5547

*Attorneys for Defendant/Appellant
Nissan North America, Inc.*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant–Appellant Nissan North America, Inc., states that its parent corporation is Nissan Motor Co., Ltd., a publicly held corporation.

Dated: June 14, 2023

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: _/s/ Amir Nassihi_
    Amir Nassihi

Attorneys for Defendant–Appellant
Nissan North America, Inc.

# TABLE OF CONTENTS

INTRODUCTION................................................................ 1

STATEMENT OF JURISDICTION................................. 2

STATEMENT OF THE ISSUES...................................... 3

STATEMENT OF THE CASE............................................ 4

    A.    Factual Background on Nissan's PSRs........................ 4

    B.    The Class Vehicles and Named Plaintiffs.................... 7

    C.    No Evidence of a Common Defect............................. 9

    D.    Plaintiffs' Evidence on Class Certification ............... 13

    E.    Equitable-Relief Procedural History......................... 15

    F.    Other PSR Litigation .................................................. 15

SUMMARY OF ARGUMENT ....................................... 16

STANDARD OF REVIEW................................................ 18

ARGUMENT...................................................................... 19

I. The District Court Abused Its Discretion in Finding a "Common Defect." ...... 19

    A.    The district court applied improper defect standards. ............. 20

    B.    The district court wrongly admitted *ipse dixit* expert testimony to support certification................................. 21

  II.    The District Court Abused Its Discretion in Holding Reliance Could Be "Presumed." .................................................. 24

  III.    The District Court Abused Its Discretion in Accepting Plaintiffs' Flawed and Insufficient Damages Model........................... 27

    A.    The district court wrongly held problems with underlying data and methodology went to "weight," not admissibility........................................................ 27

    B.    The district court wrongly relied upon a *proposed*, unperformed damages analysis....................................... 32

    C.    The district court ignored individual issues presented by used-car and leased-vehicle transactions................................... 34

D.      The district court abused its discretion in certifying equitable claims when Plaintiffs presented a damages model for legal remedies. ................................... 35

IV.     The District Court Erred in Certifying Classes Overwhelmingly Composed of Uninjured Class Members ................ 36

V.      The District Court Erred in Expanding Plaintiffs' Substantive Rights—and Foreclosing Nissan's Substantive Defenses—in Violation of the Rules Enabling Act. ....................................... 42

A.      The district court expanded Nissan's duty to disclose under the CLRA. ............................. 43

B.      The district court wrongly allowed Ms. Johnson to assert a CLRA claim based on a used-car sale .......................... 46

VI.     The District Court Erred in Certifying Unrepresented Classes. ....... 51

CONCLUSION ................................................................................ 55

STATEMENT OF RELATED CASES ................................................ 57

CERTIFICATE OF COMPLIANCE ................................................. 58

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Target Corp.,*
2014 WL 12558858 (C.D. Cal. Nov. 25, 2014) ...................................................... 29

*Anderson v. Ford Motor Co.,*
2020 WL 1853321 (W.D. Mo. Feb. 14, 2020) ...................................................... 16

*Baranco v. Ford Motor Co.,*
294 F. Supp. 3d 950 (N.D. Cal. 2018) ...................................................... 44

*Beaty v. Ford Motor Co.,*
2021 WL 3109661 (W.D. Wash. July 22, 2021) ...................................... 16, 26, 35

*Beaty v. Ford Motor Co.,*
854 F. App'x 845 (9th Cir. 2021) ...................................................... 16

*Briseño v. Henderson,*
998 F.3d 1014 (9th Cir. 2021) ...................................................... 28

*Brown v. Hain Celestial Grp., Inc.,*
913 F. Supp. 2d 881 (N.D. Cal. 2012) ...................................................... 53

*Bruno v. Burt's Bees, Inc.,*
2022 WL 17224716 (C.D. Cal. Aug. 25, 2022) ...................................................... 52

*Chamberlan v. Ford Motor Co.,*
2003 WL 25751413 (N.D. Cal. Aug. 6, 2003) ...................................................... 49, 50

*Cirulli v. Hyundai Motor Co.,*
2009 WL 4288367 (C.D. Cal. Nov. 9, 2009) ...................................................... 48

*City of Pomona v. SQM N. Am. Corp.,*
750 F.3d 1036 (9th Cir. 2014) ...................................................... 18

*Clark v. Am. Honda Motor Co.,*
528 F. Supp. 3d 1108 (C.D. Cal. 2021) ...................................................... 44

*Clemens v. DaimlerChrysler Corp.,*
534 F.3d 1017 (9th Cir. 2008) ...................................................... 50

iv

*Cooper v. Firestone Tire & Rubber Co.,*
945 F.2d 1103 (9th Cir. 1991) ..............................................51, 52

*Daniel v. Ford Motor Co.,*
806 F.3d 1217 (9th Cir. 2015) ................................................ 24

*Daugherty v. Am. Honda Motor Co.,*
144 Cal. App. 4th 824 (2006) .................................................. 46

*Day & Zimmermann, Inc. v. Challoner,*
423 U.S. 3 (1975) ...................................................................... 50

*Del Webb Cmtys., Inc. v. Partington,*
652 F.3d 1145 (9th Cir. 2011) ................................................ 51

*Durkee v. Ford Motor Co.,*
2014 WL 4352184 (N.D. Cal. Sept. 2, 2014) ...................... 46

*Fulford v. Logitech, Inc.,*
2008 WL 4914416 (N.D. Cal. Nov. 14, 2008) ..................... 49

*Green v. Canidae Corp.,*
2009 WL 9421226 (C.D. Cal. June 9, 2009) ...................... 49

*Grodzitsky v. Am. Honda Motor Co.,*
957 F.3d 979 (9th Cir. 2020)................................. 16, 20, 22

*Guido v. L'Oreal, USA, Inc.,*
2014 WL 6603730 (C.D. Cal. July 24, 2014)...................... 33

*Hadley v. Kellogg Sales Co.,*
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ...........................29, 30

*Halliburton Co. v. Erica P. John Fund, Inc.,*
573 U.S. 258 (2014) .................................................................. 32

*Hawes v. Macy's Stores W., Inc.,*
2022 WL 194407 (S.D. Ohio Jan. 22, 2022) ...................... 29

*Hemmings v. Tidyman's Inc.,*
285 F.3d 1174 (9th Cir. 2002) ................................................ 51

*Hindsman v. GM LLC,*
2018 WL 2463113 (N.D. Cal. June 1, 2018)...................... 44

*In re Asacol Antitrust Litig.,*
 907 F.3d 42 (1st Cir. 2018) ...................................... 38

*In re ConAgra Foods, Inc.,*
 302 F.R.D. 537 (C.D. Cal. 2014) ............................ 28

*In re NJOY, Inc. Consumer Class Action Litig.,*
 120 F. Supp. 3d 1050 (C.D. Cal. 2015) .................. 29

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
 934 F.3d 619 (D.C. Cir. 2019) ................................ 38

*Kansas City S. Ry. v. Sny Island Levee Drainage Dist.,*
 831 F.3d 892 (7th Cir. 2016) .................................. 34

*Kas v. Mercedes-Benz USA, LLC,*
 2012 WL 12886203 (C.D. Cal. Jan. 19, 2012) ........ 48

*Kearns v. Ford Motor Co.,*
 567 F.3d 1120 (9th Cir. 2009) ................................ 45

*Kondash v. Kia Motors Am., Inc.,*
 2020 WL 5816228 (S.D. Ohio Sept. 30, 2020) ........ 16

*Kosak v. United States,*
 465 U.S. 848 (1984) (Marshall, J.) ......................... 47

*Kramer v. Toyota Motor Corp.,*
 668 F. App'x 765 (9th Cir. 2016) ............................ 21

*Lohr v. Nissan N. Am., Inc.,*
 2022 WL 1449680 (W.D. Wash. May 9, 2022) ...... 15, 32

*Lohr v. Nissan N. Am., Inc.,*
 2022 WL 17591499 (9th Cir. Sept. 26, 2022) ......... 16

*Maldonado v. Apple, Inc.,*
 2021 WL 1947512 (N.D. Cal. May 14, 2021) .......... 30

*Mazza v. Am. Honda Motor Co.,*
 666 F.3d 581 (9th Cir. 2012), *overruled on other grounds by Olean,*
 31 F.4th 561 ........................................................... 19

*Milan v. Clif Bar & Co.*,
  2021 WL 4427427 (N.D. Cal. Sept. 27, 2021)....................................30, 31

*Morris v. Farmers Ins. Exch.*,
  2006 WL 3823522 (Cal. Ct. App. Dec. 28, 2006) .................................... 48

*MyFord Touch Consumer Litig.*, 2018 WL 3646895 (N.D. Cal. Aug. 1,
  2018) ........................................................................................................ 26

*O'Connor v. Uber Techs., Inc.*,
  904 F.3d 1087 (9th Cir. 2018) .................................................................. 2

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc), *cert. denied*, 2022 WL
  16909174 (Nov. 14, 2022) ............................... 18, 19, 32, 33, 34, 36, 38, 41, 42, 43

*Priester v. Cromer*,
  736 S.E.2d 249 (S.C. 2012) ....................................................................... 5

*Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp.*,
  694 F.2d 1150 (9th Cir. 1982) ................................................................ 28

*Quacchia v. DaimlerChrysler Corp.*,
  122 Cal. App. 4th 1442 (2004).........................................................53, 54

*Raynaldo v. Am. Honda Motor Co.*,
  2022 WL 4358096 (N.D. Cal. Sept. 20, 2022)...................................25, 45

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
  62 P.3d 142 (Co. 2003).............................................................................. 24

*Schauer v. Mandarin Gems of Cal., Inc.*,
  125 Cal. App. 4th 949 (2005) ............................................................46, 48

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020)................................................................... 35

*Sonner v. Premier Nutrition Corp.* ("*Sonner II*"),
  49 F.4th 1300 (9th Cir. 2022) ................................................................. 36

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011), *abrogated on other grounds by*
  *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ............................. 18, 19, 25

*Stotz v. Mophie Inc.,*
2017 WL 1106104 (C.D. Cal. Feb. 27, 2017) .......................................................... 54

*T.T. v. Supercell, Inc.,*
2023 WL 2562395 (N.D. Cal. Mar. 17, 2023) .......................................................... 52

*Testone v. Barlean's Organic Oils, LLC,*
2021 WL 4438391 (S.D. Cal. Sept. 28, 2011) .......................................................... 33

*Thayer v. Benjamin Franklin Plumbing,*
2011 WL 5056277 (Cal. Ct. App. Oct. 25, 2011) .............................................. 46, 48

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) ...................................................................................... 38, 39

*Van v. LLR, Inc.,*
61 F.4th 1053 (9th Cir. 2023) ................................................................................ 41

*Vega v. CarMax Auto Superstores Cal., LLC,*
2018 WL 3216347 (Cal. Ct. App. July 2, 2018) ................................................ 46, 48

*Wal–Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) .......................................................................................... 40, 42

*Watkins v. MGA Ent., Inc.,*
550 F. Supp. 3d 815 (N.D. Cal. 2021) .................................................................... 49

*Webb v. Carter's, Inc.,*
272 F.R.D. 489 (C.D. Cal. 2011) ............................................................................ 26

*Wendt v. Host Int'l, Inc.,*
125 F.3d 806 (9th Cir. 1997) ................................................................................ 28

*Wilens v. TD Waterhouse Grp., Inc.,*
120 Cal. App. 4th 746 (2003) ................................................................................ 43

*Williams & Fickett v. County of Fresno,*
2 Cal. 5th 1258 (2017) .......................................................................................... 44

*Williams v. Yamaha Motor Co.,*
851 F.3d 1015 (9th Cir. 2017) ................................................................................ 16

*Wit v. United Behav. Health,*
58 F.4th 1080 (9th Cir. 2023) ................................................................................ 42

*Withers v. eHarmony, Inc.*,
   2011 WL 8156007 (C.D. Cal. Mar. 4, 2011) .......................... 24

*Zakaria v. Gerber Prods. Co.*,
   755 F. App'x 623 (9th Cir. 2018) .......................... 29

*Zeiger v. WellPet LLC*,
   2021 WL 756109 (N.D. Cal. Feb. 26, 2021) .......................... 28

## STATUTES

28 U.S.C. § 1292(e) .......................... 2

28 U.S.C. § 1332(d) .......................... 2

28 U.S.C. § 2072(b) .......................... 42

49 U.S.C. §§ 30101 et seq. .......................... 4

Cal. Civ. Code § 1770(a) .......................... 50

Cal. Civ. Code § 1780(a) .......................... 47, 50

Cal. Civ. Code § 3531 .......................... 44

## OTHER AUTHORITIES

49 C.F.R. § 571.205.S5.1 .......................... 4

Fed. R. Civ. P. 23 .......................... 2, 13, 14, 32, 36, 41

Fed R. Evid. 702 .......................... 21, 23, 28, 31, 33, 34

James S. Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act*, 2 PAC. L.J. 1, 10 (1971) .......................... 47

Reg. Sess. (Cal. May 22, 1970) .......................... 47

Reg. Sess. (Jan. 21, 1970) .......................... 47

## INTRODUCTION

Plaintiffs' case centers around a theory that Nissan's panoramic sunroofs ("PSRs") are defectively designed because they allegedly have a "propensity" to break, and Plaintiffs fault Nissan for not disclosing this alleged propensity. Hit with enough force, all glass breaks. That is not a defect; it is the nature of the material. Plaintiffs never tried to *measure* the alleged propensity to break, much less to ascertain whether and how the PSR design affects it. They simply argued that, because they contend there is an undisclosed defect in the form of an alleged, undefined propensity to break, all consumers must be similarly situated for class-certification purposes. If that were the law, every product case would be suited for class treatment.

Nissan's PSRs are constructed with tempered safety glass, which the Federal Motor Vehicle Safety Standards authorize for use in roof openings and elsewhere. Tempered safety glass is the industry norm for PSRs. Nissan has never represented that the glass used in its vehicles (PSR glass or other glass) would never break. It expressly excludes glass breakage in its warranties.

The district court certified California, Colorado, Florida, and New York statewide classes without analyzing Plaintiffs' experts' propensity-to-break testimony. This was not a battle-of-the-experts situation; Plaintiffs offered *no* evidence that Nissan's PSRs break more often than any other PSRs, or, for that matter, that the rate is higher than might otherwise be normal for any glass part.

Nor did Plaintiffs offer any evidence that the miniscule breakage rate (less than a 0.2% risk of a break for any reason—including car wrecks—in the first 15 years of service) would necessarily be material to any reasonable consumer. The district court abused its discretion in certifying classes when it failed to rigorously analyze the evidence and resolve factual conflicts that mattered to the Rule 23 analysis, instead putting them off until trial.

The district court also erred in other ways. It defined "materiality" in a way that virtually guarantees liability. It accepted and relied on an unperformed, error-riddled conjoint analysis. It certified classes overwhelmingly comprising uninjured persons. It expanded state law to certify classes, violating the Rules Enabling Act. And it included categories of class members lacking a representative. For those reasons, too, the district court abused its discretion in certifying the classes.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). On July 21, 2022, the district court issued an order certifying the classes at issue. 1-ER-2. On August 4, 2022, Nissan timely petitioned for permission to appeal the class certification order under Rule 23(f). *See* Ninth Cir. Case No. 22–80075. This Court granted the petition on October 25, 2022. 2-ER-44-45. This Court has jurisdiction to review the district court's class certification order under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018).

# STATEMENT OF THE ISSUES

**I.** Did the district court abuse its discretion by applying an improper standard in ruling that an allegedly common "defect" could be proven with common evidence when the party seeking certification offered no admissible expert evidence of an actual defect?

**II.** Did the district court abuse its discretion in holding that materiality and reliance could be proven with common evidence, defining those terms in such a way that they will necessarily be "presumed" in virtually any case?

**III.** Did the district court abuse its discretion in admitting, and basing its grant of certification upon, an unperformed conjoint analysis riddled with flaws?

**IV.** Did the district court abuse its discretion in certifying classes where the vast majority of members are, and will remain, uninjured?

**V.** Did the district court abuse its discretion in using Rule 23 to expand Plaintiffs' rights—and limit Nissan's defenses—in violation of the Rules Enabling Act?

**VI.** Did the district court abuse its discretion in certifying classes that included vehicles physically distinct from the Nissan vehicles purchased by the named Plaintiffs, and by including lessees in the classes?

# STATEMENT OF THE CASE

## A. Factual Background on Nissan's PSRs

Nissan offers PSRs in some of its vehicles. Plaintiffs contend these PSRs have a "propensity to spontaneously shatter," and their inclusion in vehicles is a safety hazard Nissan should have disclosed at the time of sale. *See* Fifth Am. Compl. ("5AC"), 3-ER-587; 3-ER-624. Plaintiffs contend this shattering propensity exists because Nissan uses "4mm thick, curved glass, that is fully tempered, painted around the edges with frit [ceramic paint], and mounted to the sunroof frame." 2-ER-85.

Initially, Plaintiffs alleged that "under ordinary driving conditions, and in some instances when the vehicle is parked or not otherwise in motion, the glass spontaneously shatters." 10-ER-2479. That is, they alleged PSRs could "spontaneously" shatter even without external damage. Plaintiffs have since abandoned that theory for lack of evidence. They now concede external damage is necessary for a PSR to break, and argue that initially-undetected damage may spread, causing a break that *appears* spontaneous. 2-ER-194–195.

Nissan's PSRs are made from tempered safety glass (the industry norm for PSRs), which complies with Federal Motor Vehicle Safety Standards ("FMVSS").[1]

---

[1] The National Highway Traffic Safety Administration ("NHTSA") sets FMVSS. 49 U.S.C. §§ 30101 et seq. FMVSS 205 governs glazing (glass) in automobiles, dictating how resistant to breakage sunroof glass should be and how small pieces should be in the event of a break. See 49 C.F.R. § 571.205.S5.1 (requiring

8-ER-1979. The vast majority of automakers use tempered safety glass for PSRs because it is treated to be impact-resistant, making it considerably stronger than the alternatives (annealed or laminated glass). *Id.* And, from a safety perspective, in the rare event that tempered glass does break, it produces small, round-edged, relatively dull fragments rather than the sharp shards associated with the alternatives. *Id.* Nissan's materials informed the consumer that vehicle glass could break, although there is no evidence Plaintiffs ever read that statement or any PSR-related statements in the owner's manual or warranties before their purchases. *See* 6-ER-1413-14 (Nissan warranty excludes damage resulting from "[g]lass breakage").

Plaintiffs offered no data estimating the rate at which PSRs break. The district court ruled doing so was unnecessary because a "qualitative" descriptor offered by a damages expert was sufficient. 1-ER-17. But Plaintiffs offered no qualitative evidence to support their theory either. The "qualitative" nature of the alleged defect was based on *ipse dixit* statements by Plaintiffs' expert, unsupported by testing, statistical analysis, or empirical measurements. *See* 9-ER-2233 (stating PSRs' glass was too thin, panels were too large, and glass was weakened by

---

conformity with American National Standards Institute's standards). The standard allows automakers to use either tempered safety glass or laminated glass (annealed glass bonded with plastic interlayers). *See Priester v. Cromer*, 736 S.E.2d 249, 255–57 (S.C. 2012) ("Since … the 1960s, FMVSS 205 has provided that … tempered glass may be used anywhere in the vehicle except the windshield.").

curvature and application of ceramic frit); 2-ER-187 (Read saying he has "seen no vehicle"), 2-ER-187-88 (agreeing he has done no testing of stressors), 2-ER-201 (agreeing he has not compared the incident rate of the class vehicles to that of other manufacturers), 2-ER-215 (acknowledging he does not know the impact of frit), 2-ER-226 (stating he would consider tempered safety glass defective regardless of thickness), 2-ER-240 (admitting he has not "tested any Nissan sunroofs"), 2-ER-254-55 (agreeing he has not measured the effect of the curved glass), 2-ER-257 (agreeing he has not measured the stress added from the connection to the frame).

Nissan's technical experts, in contrast, undertook the task of calculating a fracture rate and found no defect; 99.85% of units sold have never had their PSR break, and, for the few that did break, a known event—*e.g.*, car wreck, hail damage, vandalism—explained why. 6-ER-1359; 11-ER-2631; 6-ER-1365-66; 11-ER-2634-36; 1-ER-4. Nissan's experts further estimated that the lifetime PSR breakage rate from any cause is less than 0.2% at 15 years in service. *Id.*[2]

Though Plaintiffs contend, ironically, tempered *safety* glass use creates a "safety issue," they have never identified a single case where a broken PSR prompted anyone to seek medical attention. This is unsurprising: the point of tempered safety glass—and the reason FMVSS permits its use—is that if it does fracture, it breaks into small pieces unlikely to result in injuries.

---

[2] Per Plaintiffs, the expected useful life of a vehicle is less (10, not 15, years). 9-ER-2274-75.

### B. The Class Vehicles and Named Plaintiffs

The district court certified state classes in California, Colorado, Florida, and New York, each composed of owners and lessees of: 2009–2014 and 2016–2020 Nissan Maximas; 2009–2020 Nissan Muranos; 2014–2020 Nissan Rogues; and 2013–2020 Nissan Pathfinders. 1-ER-3, 1-ER-42. Over Nissan's objection, the district court also included 2013 Infiniti JX and 2014–2020 Infiniti QX60 models, even though the sole Infiniti plaintiff dismissed her claims. *Id.*; 9-ER-2299; 1-ER-41.

While these Nissan models use tempered safety glass for PSRs, the design of each PSR varies by model, and even by year within the same model. Nissan's glass expert, Dr. Paul Verghese, noted the "PSR glass panels differ in size and shape, and in particular locations of their PSR glass panels on the vehicle's roof." 8-ER-2004. Dr. Verghese's report contains details on each vehicle model, including the position of the PSR, the size of the panel, and whether it is fixed or moveable. 8-ER-2006. Plaintiffs' proposed design expert, Dr. Read, conceded that different sizes and structures can affect fracture vulnerability (or propensity to break) in the PSRs. 2-ER-220.

Four Plaintiffs remain in the litigation. Sherida Johnson, the sole California representative, bought a used 2016 Nissan Maxima in August 2016, from CarMax, a third party unaffiliated with Nissan. 3-ER-497; 3-ER-522; 3-ER-524. Johnson's PSR broke in October 2016. 3-ER-535. The repair shop concluded an object-strike

caused the PSR to break. 3-ER-540-541; 3-ER-474. A subsequent investigation showed Johnson's vehicle has been exposed to external impacts on numerous surfaces, including the glass. 8-ER-2000-03. Johnson never read the portion of the owner's manual pertaining to the sunroof and would not have seen any disclosure made there. 3-ER-503.

Linda Spry, the sole Colorado representative, bought a new 2012 Murano in February 2013. 3-ER-434. Spry's PSR broke in October 2016. 3-ER-453-54. The dealership concluded an object strike broke it. 3-ER-465. The only discussion she had with the salesperson about the PSR was to note its presence. 3-ER-425. She never read the owner's manual before purchase. 3-ER-430-31.

Lisa Sullivan, the sole Florida representative, bought a new 2012 Murano in May 2012. 3-ER-379. She did not read the owner's manual prior to use. 3-ER-388. Sullivan's PSR broke in August 2015. *See* 3-ER-396. Evidence showed Sullivan drove her Murano extensively after the break, causing glass to spread through the vehicle and requiring a replacement of the frame. 3-ER-362. A subsequent inspection showed numerous damage sites 0.5–1.0mm across, including damage to other pieces of glass and to the paint on the hood. 8-ER-1987-1991. There was evidence her vehicle had been in conditions exposing it to rock or similar strikes. *Id.*

Subrina Seenarain, the sole New York representative, bought a used 2014 Maxima in November 2015. 2-ER-303. She did not recall any specific statements

Nissan or the dealership made about the PSR. 2-ER-279-82; 2-ER-286-289; 2-ER-294. She does not recall looking at the owner's manual before buying, and still has not read it thoroughly. 2-ER-300-01. Seenarain's PSR broke in September 2016. 3-ER-353-357; 2-ER-260. She was involved in two accidents in her Maxima; both sent her to the hospital in an ambulance, and one also deployed the airbags. 2-ER-310-15; 2-ER-336-341. Neither accident caused her PSR to break. *Id.*

## C.  No Evidence of a Common Defect

Nissan demonstrated before the district court that Plaintiffs had no admissible evidence of a common design issue that increased the PSRs' "propensity" to break.[3] Plaintiffs fault Nissan for using tempered glass and further claim that the thickness, curvature, fritting, and connection to the frame contributed to a "propensity" for the glass to break. 2-ER-85. But Plaintiffs never investigated any of these factors, either alone or in combination—a fact their proposed expert, Dr. Read, readily concedes. *See* 2-ER-187-88, 2-ER-201, 2-ER-215, 2-ER-226, 2-ER-240, 2-ER-254-55, 2-ER-257. The only evidence they have on this point is Read's *ipse dixit* testimony, which Nissan moved to exclude. 1-ER-18-19.

Neither Read nor Plaintiffs' other glass expert, Neil Hannemann, bothered to assess how many Nissan PSRs have actually broken or to calculate a fracture

---

[3] Nissan presented this evidence in its summary judgment motion, its expert challenges, and its class briefing, all of which the district court resolved in a single order. *See* 1-ER-2.

rate. 2-ER-115 (Hannemann stating that "the rate is not something I looked at in this case."); 2-ER-188-189 (Read stating the same); 2-ER-201 (Read agreeing he has not compared the incident rate of the class vehicles to that of other manufacturers). Beyond stating that even one PSR break is "too many," they offer no opinion about an acceptable failure rate. 2-ER-163 (Hannemann agreeing he has no opinion); 2-ER-204 (Read agreeing that "all the manufacturers that make panoramic sunroofs with tempered safety glass" are making products which "are defective for the same reasons that [he] find[s] the Nissan" PSRs defective); 2-ER-246-47 (Read agreeing he has not identified an acceptable fracture rate beyond zero and calling all PSRs using tempered safety glass defective).

In its tentative rulings, the district court said it would exclude Dr. Read's opinions because he "did not explain how each [of these factors] contributes" to the supposed propensity to break. 2-ER-80-81. At the hearing, Nissan pointed out that if Read's combination theory was excluded, it would logically have to grant summary judgment because there was no evidence Nissan concealed the use of tempered glass itself, so Plaintiffs' omission theory could not proceed without Read's opinion that something else about the glass was problematic. 2-ER-50-52. The district court thereafter did an about face, saying in its final order that "[e]ven if Read does not know the exact effect that each individual element had to the overall propensity to shatter, he sufficiently opines that each element does have such an effect and that, together, they create a defect," adding that "this is not the

10

sort of opinion that needed to be physically tested" because, it asserted, *Daubert* requires only testability, not actual data or testing. 1-ER-21.

By contrast, Nissan's expert, Dr. Verghese, did considerable field testing on the glass, measuring the stress on each vehicle model under various operating conditions. 8-ER-2013-19. He found each PSR withstood more than the minimum stress for fully tempered glass. 8-ER-2019. Dr. Verghese's testing was uncontroverted.

The district court also admitted the testimony of Plaintiffs' other expert, Neil Hannemann, over Nissan's objections. Hannemann also never conducted any testing in this case. But the district court said it was enough that he evaluated the design and "examine[d] consumer complaints submitted to the government." 1-ER-18. Those consumer complaints were unverified and unreliable. 2-ER-158 (Hannemann saying he "didn't investigate the claims" and is "just taking them at face value"). The district court further admitted Hannemann's testimony on the grounds that it "requires two uncontroversial premises: (1) shattering glass while driving can reasonably be distracting and (2) distracted driving is dangerous." 1-ER-18. The district court never explained how these criticisms relate to *Nissan*'s glass, as opposed to any other sunroof glass application or relevant standard.

Based on Read and Hannemann's testimony, the district court denied Nissan's summary judgment motion. It held Plaintiffs' "experts have opined that the PSRs fail under normal driving conditions, which is sufficient to survive

summary judgment on its own." 1-ER-23. It added that Plaintiffs "have introduced evidence that consumers filed complaints about the issue, introduced reports about the shatterings, and introduced the named plaintiffs' descriptions of the events." *Id.*

Nissan also argued that the defect, if it even existed, would not be material to a reasonable consumer. It offered evidence that, in 2021, NHTSA closed an investigation analyzing PSRs (including Nissan's), finding insufficient evidence of a safety-related defect. 2-ER-92 (analyzing data from "97 distinct models produced over 11 model years totaling some 10 million vehicles," noting no crashes from driver distraction from 4,000 reported PSR breaks). Nissan also presented uncontroverted evidence that its PSRs had been on the road for tens of billions of miles without a *single* confirmed case of anyone seeking medical attention due to a broken PSR. 6-ER-1359; 11-ER-2631; 6-ER-1365-66; 11-ER-2634-36; 1-ER-4.

The district court rejected that evidence, calling the question of risk "a matter for the jury," and disagreeing with the opinion of another federal court that granted Nissan's summary judgment motion based on the same evidence, as well as conclusions reached by other courts in non-Nissan PSR cases. 1-ER-25. It held that "consumers, as a general matter, expect sunroofs not to shatter under normal driving conditions," and this was "an obvious safety issue." 1-ER-24-25. And it rejected Nissan's argument that Plaintiffs had not shown a material safety risk, saying it "would disagree even without expert evidence, based on what should really be uncontroversial common sense." 1-ER-25.

### D.  Plaintiffs' Evidence on Class Certification

Nissan argued the named Plaintiffs were not typical under Rule 23(a) because evidence showed their PSRs likely broke due to external impacts, not any defect. For instance, Johnson's Maxima had been exposed to external impacts—consistent with rock strikes—on numerous surfaces, including the glass. 8-ER-2000-03. The same was true of Sullivan: a vehicle inspection showed numerous damages sites 0.5–1.0mm across, including damage to other glass and paint on the hood. 8-ER-1990.[4] The district court sidestepped all this, calling this ground for atypicality "irrelevant" because "what matters is the design" of the PSR (again ignoring Plaintiffs' failure to introduce evidence of any design defect), not the reason it broke in a particular case. 1-ER-32. It held that even buyers whose sunroofs did not shatter could represent the class, provided they bought "their car in the state whose class they are representing" at "the price they would pay without knowledge of the defect." 1-ER-32.

Nissan also argued Plaintiffs had not shown predominance under Rule 23(b)(3). The district court rejected this argument for the same reasons it denied summary judgment. 1-ER-38. Nissan argued individualized issues predominated over common issues because there were numerous independent explanations for PSRs that broke, but the district court disagreed with that for the same reasons as

---

[4] The two remaining Plaintiffs (Spry and Seenarian) disposed of their vehicles before Nissan could inspect them. 6-ER-1337; 4-ER-806; 4-ER-926.

in the typicality analysis. *Id.* The district court rejected each of Nissan's other Rule 23(b)(3) challenges as well.

Lastly, Nissan argued Plaintiffs had not shown classwide evidence of damages. It challenged Plaintiffs' proposed damages model, which is built around a proposed conjoint analysis for Maxima vehicles designed by Steven Gaskin and Colin Weir. Nissan moved to exclude the model because the experts had not actually performed the survey that would underlie their analysis (and, indeed, they had not even proposed a survey for most of the vehicles models involved), and their proposal failed to account for supply-side factors. *See* 4-ER-732. The district court overruled these concerns, saying each went to weight, not admissibility. It held actually conducting the survey was not required because Plaintiffs "have made a tactical choice to not perform the survey yet. That may come with benefits to them—it saves expenses that may not have to be spent if the parties ultimately reach a settlement, for instance. But that choice also comes with the risk that the results will come back, be challenged, and be excluded closer to trial when there is less or no time to perform another analysis." 1-ER-9-10.

The district court's tentative ruling agreed with Nissan in part because the model did not account for differences between buyers of new and used cars. 2-ER-82. That would have meant some state classes could not be certified because the named Plaintiffs from those states (California and New York) bought used cars. But again, the court changed its mind by the final order, holding that the "parties or

court can settle on an appropriate methodology" at some point down the line. 1-ER-42.

### E. Equitable-Relief Procedural History

Nissan moved to dismiss Plaintiffs' equitable claims because they failed to plead or establish lack of adequate legal remedies. 10-ER-2465-67; 4-ER-706-08. The district court refused, holding it was "premature" (10-ER-2434) or required only a bare allegation (4-ER-694). Nissan then moved for summary judgment on, and opposed certification of, equitable claims because, among other reasons, Plaintiffs failed to show lack of an adequate legal remedy and their proposed class-damages model precluded any such showing. 3-ER-584; 2-ER-113-114.

The district court limited the monetary equitable claims (dismissing any by used-car purchasers) and denied certification of any injunctive-relief claim. 1-ER-2-3. But the district court certified the remaining monetary equitable claims, again deferring ruling on the effect of Plaintiffs' failure to establish lack of adequate legal remedies, saying it "will not be addressed now" and that Plaintiffs' remedies "will be clear at the end of the trial, not before." 1-ER-2-3, 1-ER-29.

### F. Other PSR Litigation

This is one of several similar class actions against manufacturers that offer tempered-glass PSRs. *See, e.g., Lohr v. Nissan N. Am., Inc.*, 2022 WL 1449680 (W.D.

Wash. May 9, 2022) (granting summary judgment in favor of Nissan);[5] *Beaty v. Ford Motor Co.*, 2021 WL 3109661 (W.D. Wash. July 22, 2021) (denying class certification);[6] *Anderson v. Ford Motor Co.*, 2020 WL 1853321 (W.D. Mo. Feb. 14, 2020) (granting partial summary judgment in favor of Ford); *Kondash v. Kia Motors Am., Inc.*, 2020 WL 5816228 (S.D. Ohio Sept. 30, 2020) (denying class certification).

## SUMMARY OF ARGUMENT

First, the district court abused its discretion by finding a "common defect" based on an unquantified risk that Nissan's PSRs might break at some point during the vehicle's useful life. By doing so, it applied a defect standard that this Court has rejected as an "overly expansive standard for a design defect" and that would impermissibly supplant warranty law. *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–87 (9th Cir. 2020); *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1029 (9th Cir. 2017). Further, to support its "common defect" finding, the district court erroneously admitted the opinions of Plaintiffs' experts, who did nothing to measure or test the purported "risk" of a PSR breaking or any aspect of the PSR's design that purportedly increased that risk.

---

[5] The plaintiffs in *Lohr*—an identical action against Nissan involving the same attorneys, experts, and arguments—appealed that court's grant of summary judgment, but subsequently abandoned that appeal. *See Lohr v. Nissan N. Am., Inc.*, 2022 WL 17591499 (9th Cir. Sept. 26, 2022).

[6] This Court reversed a grant of summary judgment in *Beaty* (after which, certification was denied). *Beaty v. Ford Motor Co.*, 854 F. App'x 845 (9th Cir. 2021).

Second, the district court abused its discretion by holding that materiality and reliance of omitted information could be proven with common evidence by defining those terms in a manner that would "presume" their existence in virtually any case. In doing so, it also ignored evidence to the contrary: the omitted information was not uniformly material to class members.

Third, the district court abused its discretion in accepting Plaintiffs' damages model to support certification. The model contained numerous methodological errors, including: the use of non-comparable vehicles and fictitious pricing inputs; a failure to reflect supply-side considerations and marketplace realities that would affect product pricing; ignoring the effect of used-car and leased-vehicle transactions; and no proposal whatsoever for Murano, Rogue, Pathfinder, or Infiniti vehicles. Further, Plaintiffs' experts did not even perform the analysis, which was required for Plaintiffs to prove it satisfied Rule 23.

Fourth, the district court abused its discretion by certifying classes primarily made of uninjured class members. The only evidence of PSR failure submitted established that less than 0.2% of PSRs break for any reason in the life of the class vehicles. In other words, the vast majority of class members have not suffered and never will suffer damages stemming from the alleged risk that forms the basis of Plaintiffs' defect theory and thus have no standing.

Fifth, the district court abused its discretion by expanding Plaintiffs' rights and foreclosing Nissan's defenses in violation of the Rules Enabling Act. For

example, the sole California Plaintiff, Johnson, bought her Maxima used from CarMax, a third party not affiliated with Nissan in any way. Under California law she has no claim against Nissan, and Rule 23 cannot change that.

Finally, the district court abused its discretion in certifying classes of vehicles that no named Plaintiff had purchased. These include vehicles with material design differences from those the named Plaintiffs purchased, which affects the risk of PSR failure. The classes also improperly include lessees, despite the fact that lessees generally use vehicles for periods far shorter than the "life of the vehicle" and whose purported financial harm cannot be analyzed or measured by Plaintiffs who purchased their vehicles.

For each of these reasons, this Court should reverse.

## STANDARD OF REVIEW

The "decision to certify a class and any particular underlying Rule 23 determination involving a discretionary determination" is reviewed for abuse of discretion. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc), *cert. denied*, 2022 WL 16909174 (Nov. 14, 2022). Evidentiary rulings are also reviewed for abuse of discretion. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). "An abuse of discretion occurs when the district court … relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them." *Stearns v. Ticketmaster Corp.*, 655 F.3d

1013, 1018 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). "[A]n error of law *is* an abuse of discretion." *Id.*

The "district court's determination of underlying legal questions" relevant to class certification is reviewed "de novo." *Olean*, 31 F.4th at 663. Likewise, "[w]hen the trial court's application of the facts to the law requires reference to the values that animate legal principles, [courts] review that application de novo." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (cleaned up), *overruled on other grounds by Olean*, 31 F.4th at 682 n.32.

## ARGUMENT

## I. The District Court Abused Its Discretion in Finding a "Common Defect."

Plaintiffs' theory, as described by the district court, is that Nissan designed PSRs in a way that "creates a propensity to fracture and shatter under ordinary driving conditions" and that "this shattering can be dangerous while driving." 1-ER-3. Plaintiffs offered no evidence to explain *how* the design of the PSR glass is defective. They complain about aspects of Nissan's PSRs—the use of "4mm thick, curved glass, that is fully tempered, painted around the edge with frit, and mounted to the sunroof frame"—absent any showing that these aspects impact the (undisputedly miniscule) rate at which the glass breaks. They also ignore how tempered safety glass is four to five times stronger than its alternative, laminated glass. 8-ER-1974.

The district court abused its direction by: (1) adopting an improper defect standard; and (2) relying on inadmissible expert "qualitative" opinion about a "propensity" to break while ignoring actual evidence to the contrary.

## A. The district court applied improper defect standards.

Plaintiffs argued Nissan's PSRs are defective simply because there is some unquantified chance a PSR may break during "the expected ten-year/150,000-mile useful life of a Class Vehicle" exposed to "ordinary and foreseeable conditions" during that time. 9-ER-2274-75. But this Court has rejected such life-of-the-vehicle theories as an "overly expansive standard for a design defect." *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–87 (9th Cir. 2020) (affirming certification denial; expert "stated that the regulators had a 'common defect' because they were not 'durable enough' to 'last the life of the vehicle' … and confirmed that he had no opinion concerning the proper manufacturing method that should have been utilized") (cleaned up). In any event, uncontroverted evidence shows PSRs are durable to last the useful life of the vehicle: Nissan's evidence showed that lifetime PSR breakage rate is less than 0.2% at 15 years in service. 6-ER-1359; 11-ER-2631; 6-ER-1365-66; 11-ER-2634-36; 1-ER-4.

Similarly, the district court erred by not requiring Plaintiffs' "defect" to have a "common solution." *See Grodzitsky*, 957 F.3d at 986–87 (affirming exclusion where expert "conceded that he was unable to identify a 'common solution' to the purported defect"). Plaintiffs could not establish a "common solution" because the

only alternative to tempered glass is laminated glass, which uncontradicted evidence establishes is weaker and thus **more** likely to break. 8-ER-1974; 8-ER-2077. At minimum, *Grodzitsky* illustrates that a common solution is a necessary element of a "common" defect. Plaintiffs never made such a showing.

The undisputed record evidence shows glass can break, in both conventional and panoramic sunroofs, for a variety of reasons. 8-ER-1974; 8-ER-2077. There is no single story that explains why Nissan's PSRs might break, and thus no "common" evidence of a defect that can support class certification. *Kramer v. Toyota Motor Corp.*, 668 F. App'x 765, 766 (9th Cir. 2016) (affirming denial of certification where plaintiff presented no "cognizable evidence" of common defect).

## B. The district court wrongly admitted *ipse dixit* expert testimony to support certification.

Federal Rule of Evidence 702 does not merely require use of an accepted methodology, as the district court held. It requires the opinion be "based on sufficient facts or data" and that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (d). Here, while recognizing "all glass shatters under some set of conditions," the district court manifestly erred by admitting Read's and Hannemann's opinions as evidence the PSRs had a "propensity" to break under normal conditions, without any meaningful definition of what this "propensity" standard meant. Class certification cannot rely on experts who "cobble together some form of generalized opinion, even one riddled with

scientific and methodological flaws." *Grodzitsky*, 957 F.3d at 986. Yet that occurred here.

In *Grodzitsky*, this Circuit affirmed exclusion of an expert who did not establish a proper failure rate for comparison because his "opinion was not predicated on reliable scientific methodology." *Id.* at 985–87 (holding there must be evidence the alleged defect caused the malfunction and rejecting the idea that a part is defective just because it may not last the "life of the vehicle"). The district court here excused Plaintiffs' experts from establishing an acceptable *quantitative* failure rate, instead concluding that "a jury could reasonably conclude that a *qualitative* descriptor of 'very small chance' is likely more helpful to many consumers than a quantitative one." *See, e.g.*, 1-ER-14, 1-ER-17 (emphasis added). There are multiple problems with this. To begin, the "very small chance" language latched onto by the district court comes from the report of Plaintiffs' survey expert, who, in turn, testified it was based on his review of the Complaint and his discussions with class counsel, not on empirical record evidence of an actual propensity to break rate. 7-ER-1636-38. More crucial, "helpfulness" does not establish reliability; it is the other way around. A "qualitative" statement that a PSR has a "propensity" to fail or that a component part should have been "more durable" lacks scientific basis unless it quantifies how durable the PSR *should* have been, and how it allegedly fell short.

Read's testimony was not based on empirical investigation of a connection between tempered glass—its thickness, curvature, fritting, or attachment to the chassis—and its propensity to break. He admitted he did not bother to measure any of this. *See* 2-ER-215 ("I don't know what exact influence the frit has on the failure," adding, "I don't necessarily see any influence of the frit."); 2-ER-226 (agreeing he would consider tempered safety glass defective regardless of thickness); 2-ER-254-55 (agreeing he has not measured the effect of glass curvature); 2-ER-257 (agreeing he has not measured the stress resulting from the connection to the frame). His expert analysis boiled down to simply listing attributes, and thus any opinion as to the cause of a PSR fracture is mere speculation.

While the district court tentatively ruled it would exclude Read's opinions because he could not explain how *any* of these factors affected a propensity to break (2-ER-80-81), it ultimately held Read "sufficiently opines that each element does have an effect." 1-ER-21. It further held actual testing and data were not required because *Daubert* (as opposed to Rule 702) requires only "testability." This, too, was error. The proponent of expert testimony must prove admissibility by a preponderance of the evidence. Fed. R. Evid. 702 (advisory committee note). This includes showing the opinion is based on "sufficient facts or data." Fed. R. Evid. 702(b). The district court identified no evidence that Read's opinion was anything other than impermissible *ipse dixit.*

The district court also erroneously admitted Hannemann's opinion that PSRs are dangerous. It held this opinion was based on "uncontroversial common sense" that distracted driving is dangerous and shattering glass can be distracting. 1-ER-18; 1-ER-25. But even a federal judge's "common sense" is not *evidence*. Hannemann interviewed no one, inspected nothing, analyzed nothing, and did not confirm any anecdotal reports he reviewed. He offered no evidence that the alternatives—laminated or annealed glass—were any less dangerous: in fact, not just "common sense" but actual evidence suggests they would be *more* dangerous, because they are inherently weaker. It was an abuse of discretion to accept the opinion of either expert here.

## II. The District Court Abused Its Discretion in Holding Reliance Could Be "Presumed."

Reliance is an essential element of many of Plaintiffs' consumer-protection claims. *See, e.g., Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (fraudulent omission claim); *Withers v. eHarmony, Inc.*, 2011 WL 8156007, at *3 (C.D. Cal. Mar. 4, 2011) (UCL and CLRA claims); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147–48 n.11 (Co. 2003) (requiring that a plaintiff show that the "defendant intended to induce reliance on that deception") (citations omitted); 1-ER-25 ("The parties appear to agree that each of the consumer protection statutes at issue requires reliance…."). Here, the district court held Plaintiffs were entitled to a "presumption of reliance" because the omission

was supposedly "material" under a "reasonable consumer" standard, even though Plaintiffs never articulated what the disclosure should have said or where it should have appeared. 1-ER-25-26; 1-ER-39; *see also Raynaldo v. Am. Honda Motor Co.*, 2022 WL 4358096, at *7 (N.D. Cal. Sept. 20, 2022) ("[A] plaintiff asserting an omission-based claim must allege the information that the defendant allegedly omitted and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that the plaintiff relied on to make her purchase but that failed to include the allegedly omitted information."). This error affected the class certification analysis.[7] It removed from the analysis whether each class member would have seen the disclosure and the many ways in which class members may have factored the disclosure into their individual purchase analyses. There is no "presumption" of reliance in fraudulent-omission cases, and certainly not the conclusive presumption the district court applied. Reliance can be *inferred* classwide, but only if the omitted information was necessarily material to all class members. If the "omission is not material as to all class members, the issue of reliance would vary from consumer to consumer and the class should not be certified." *Stearns*, 655 F.3d at 1022–23 (cleaned up).

---

[7] This presumption-of-reliance error also affected Nissan's summary judgment motion—where the evidence showed Plaintiffs never saw, heard, or relied on a statement or disclosure about PSRs.

Here, Plaintiffs did not present *any* classwide evidence of materiality. In contrast, Nissan presented evidence that materiality varied among class members. For example, Spry resold her vehicle without bothering to tell her buyer that she believed the PSR was defective and unsafe, and when she later called the buyer to make that disclosure, the buyer did not care enough to ask for even a partial refund. 6-ER-1341-42; 8-ER-2114; 6-ER-1335-37. Nissan's expert Dr. Nauhaus also presented uncontroverted opinions that different automobile buyers value different aspects of vehicles differently. 8-ER-2103-04. This was evidence that information about the omitted "defect" was not uniformly material, so the "reasonable consumer" standard could not be used to establish predominance. *See, e.g., Webb v. Carter's, Inc.*, 272 F.R.D. 489, 502 (C.D. Cal. 2011) (where defendants offer "evidence that materiality would vary from consumer to consumer … the reasonable consumer standard cannot be applied.").

Moreover, while Nissan's internal information did not support providing a warning in the first place (because there was no defect to disclose), Nissan presented evidence showing press speculation about potential PSR breakage risks varied over time, which would further offset the materiality of any alleged non-disclosure. 8-ER-2112-14. *See also, e.g., Beaty*, 2021 WL 3109661, at *12 (denying certification due to variations in knowledge over time); *MyFord Touch Consumer Litig.*, 2018 WL 3646895, at *3 (N.D. Cal. Aug. 1, 2018) (decertifying class for

consumer-protection claim; same). The district court ignored this variation, instead concluding without support that knowledge was a common issue. 1-ER-38.[8]

The district court abused its direction by refusing to consider the effect of Nissan's undisputed evidence on these issues, stating "the question is whether the omitted information would be material to a reasonable consumer—and the presumption of reliance that follows." 1-ER-39. In other words, the court erroneously treated its "presumption" as a justification for ignoring Nissan's evidence that showed no presumption was warranted. This approach would mean that reliance and materiality could *never* be individual issues that posed an obstacle to certification. That is not the law.

## III. The District Court Abused Its Discretion in Accepting Plaintiffs' Flawed and Insufficient Damages Model.

### A. The district court wrongly held problems with underlying data and methodology went to "weight," not admissibility.

The district court abused its discretion by basing certification upon a proposed (but not performed) damages survey and related conjoint analysis by Plaintiffs' experts, Weir and Gaskin. Nissan moved to exclude their testimony because of numerous methodological errors, including the inclusion of non-comparable (*i.e.*, non-Nissan) vehicles and fictitious Manufacturer's Suggested

---

[8] The Lohr court did examine this same evidence and found it "failed to demonstrate Nissan's knowledge of the defect prior to when [plaintiffs] received their vehicles in 2013 and 2015." 2022 WL 1449680, at *3–4.

Retail Prices (*i.e.*, even though real world MSRPs for the subject vehicles existed). But the district court overruled Nissan's objections, holding "attribute selection … goes to weight and not admissibility." 1-ER-13 (cleaned up) (citing *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997)).

That is not the law governing Rule 702 motions. In holding that underlying data went only to "weight," *Wendt* relied (without analysis) on a 1982 decision that predated both *Daubert* and Rule 702. *Wendt*, 125 F.3d at 814 (citing *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir. 1982)). Rule 702(b) now states admissibility requires that testimony be "based on sufficient facts or data." Similarly, Rule 702(d) requires finding that the "expert has reliably applied the principles and methods to the facts of the case." The challenged "attribute selection" here affected Plaintiffs' collection of data and how the experts' methods would apply to the facts of the case. Proper attribute selection is therefore an *admissibility* problem, not a weight problem.

This Court itself has criticized Weir's approach before. *Briseño v. Henderson*, 998 F.3d 1014, 1029 (9th Cir. 2021) ("Because Mr. Weir's testimony is unverifiable, it is ultimately worth as little as the settlement's injunctive relief."). District courts have similarly criticized both Weir and Gaskin and excluded their testimony. *See, e.g.*, *Zeiger v. WellPet LLC*, 2021 WL 756109, at \*11 (N.D. Cal. Feb. 26, 2021) (excluded because they overestimated damages to be more than 100% of the purchase price); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 577 (C.D. Cal. 2014)

(holding plaintiffs had not shown damages could be calculated classwide; stating that "[a]lthough Weir describes the methods he would use to make the calculation—hedonic regression and conjoint analysis—he does not report that he has actually employed them...."); *Adams v. Target Corp.*, 2014 WL 12558858, at \*2–3 (C.D. Cal. Nov. 25, 2014) (rejecting Gaskin's proposed conjoint analysis).

But the problem with Weir and Gaskin is not just what they included, but also what they failed to include. This Court has held that a proposed measure of classwide damages must "reflect supply-side considerations and marketplace realities that would affect product pricing." *Zakaria v. Gerber Prods. Co.*, 755 F. App'x 623, 624 (9th Cir. 2018). Conjoint surveys by plaintiffs frequently fail this test because they measure only a consumer's willingness to pay without evaluating other market forces. *Id.*; *see also In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118–19 (C.D. Cal. 2015) (rejecting conjoint analysis because it "looks only to the demand side of the market equation") (cleaned up). As next explained, Weir and Gaskin did not include supply-side considerations.

This "supply-side argument" about the propriety of conjoint analysis "is a recurring foil in consumer class actions." *Hawes v. Macy's Stores W., Inc.*, 2022 WL 194407, at \*6 (S.D. Ohio Jan. 22, 2022). A deepening intra-circuit split has emerged, with some courts saying conjoint surveys can adequately account for supply-side considerations for damages calculations, and others rejecting that theory. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105–06 (N.D. Cal. 2018)

(collecting cases). But under either line of cases, the district court's certification decision in this case was in error.

Even those cases embracing conjoint analysis all have one trait in common: they require the use of "real world" prices in the survey. *Maldonado v. Apple, Inc.*, 2021 WL 1947512, at *22 (N.D. Cal. May 14, 2021); *Hadley*, 324 F. Supp. 3d at 1106 (admitting Gaskin's proposed conjoint analysis because it "utilizes prices that mirror those actually observed in the market"); *Milan v. Clif Bar & Co.*, 2021 WL 4427427, at *7 (N.D. Cal. Sept. 27, 2021) ("[Gaskin] will use actual market prices that prevailed during the class period and the actual quantities of products sold during the class period. … That resolves Clif's main objection to Gaskin's method and opinions….").

Gaskin and Weir admit that using real-world prices is the only way their survey can pass muster. Gaskin claims he "accounts for appropriate supply side factors" because "the price range to be used in the survey will reflect the actual market prices." 9-ER-2178. Weir says this is important because such prices "reflect the supply side factors then extant in the marketplace." 9-ER-2138-39. *But Gaskin did not rely on actual prices.* He instead used six fictitious MSRPs—$20,000; $26,000; $32,000; $38,000; $44,000; and $50,000—that are in no way based on marketplace realities for Maxima vehicles. 9-ER-2191.

The actual MSRP of the lowest-priced Maxima during the proposed class period ranged from $29,290 (in 2009) to $34,250 (in 2020). 8-ER-1900. The highest

actual MSRP for any Maxima during the period was $42,860 (in 2020), with a few hundred dollars more possible for optional equipment. *Id.* These prices represent the outer bounds of the actual prices during the proposed class period, and the vast majority of the real-world MSRPs were not at either end of these extremes. In short, the survey price range starts 31.7% lower than the lowest MSRP during an eleven-year period, and ends 16.7% higher than the highest MSRP during that period. This is not only inexact, it is prejudicially unrealistic. Rule 702(b) states that admissibility requires that testimony be "based on sufficient facts or data." That axiomatically includes correct facts and data. If a conjoint analysis is to reflect supply-side considerations, use of real world prices is essential.

There are greater concerns for other models: Gaskin never even bothered to propose a conjoint survey for the other Nissan models at issue (the Murano, Rogue, or Pathfinder), he just promised to do a "substantially similar" survey for them. 9-ER-2172. Even more egregious is the fact the district court included Infiniti vehicles in the classes even though Gaskin himself questioned whether he could get enough responses to prepare a similar survey for Infiniti. 7-ER-1670-71. The district court never addressed these points before certifying the classes, despite Nissan's opposition explaining why Gaskin's unperformed partial survey with arbitrarily selected prices failed to satisfy Plaintiffs' Rule 23 burden. 8-ER-2118-21.

**B.** **The district court wrongly relied upon a *proposed*, unperformed damages analysis.**

A centerpiece of Plaintiffs' certification evidence was their promised-but-unperformed conjoint analysis. In the identical *Lohr* case, which involved the same allegations and arguments, Judge Martinez rejected the plaintiffs' promise to show their work later, saying "th[e] evidence has not been created yet, so the Court cannot consider it." 2022 WL 1449680, at *5. In contrast, here, the district court held that "showing a damages model is appropriate for purposes of class certification … does not require actually performing it, it just requires showing that it meets the legal requirements for class-based damages." 1-ER-9-10. The district court further held it did not have to rule on admissibility at certification: "if there is some reason that the results themselves are inadmissible here—or if they reveal a flaw in the survey apparent only once they exist—Nissan may move to exclude them *in limine*." 1-ER-10. This was error.

Class certification requires plaintiffs to "actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014); *see also Olean*, 31 F.4th at 664. "A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." Fed. R. Civ. P. 23 (advisory committee notes to 2003 amendments). *Olean* held a court may admit a proposed classwide damages model "provided that the district court considers factors that

may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs such as false positives) and resolves disputes raised by the parties." 31 F.4th at 683. But admitting an unperformed survey, as the district court did, precludes consideration of these required factors. It **could not** consider erroneous inputs or nonsensical outputs because the study had not been performed. The district court acknowledged this in its opinion, when it held the analysis could "be excluded closer to trial." 1-ER-10. *Olean* does not allow for postponing this analysis.

The district court recognized a split in the Ninth Circuit on this issue: "I recognize that a few courts have excluded surveys (including by Gaskin) for being unperformed." 1-ER-11 (citation omitted); *see also Testone v. Barlean's Organic Oils, LLC*, 2021 WL 4438391, at *17 (S.D. Cal. Sept. 28, 2011) (noting divide and listing cases). But even those cases that accept an unperformed survey required a plaintiff to show that damages are capable of classwide measurement. *Testone*, 2021 WL 4438391, at *17; *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *8 (C.D. Cal. July 24, 2014). Plaintiffs did not do that here.

Here, the district court sided with courts that admitted unperformed conjoint analyses, reasoning courts that excluded them "did not attempt to square their decisions with *Daubert*'s holding about focusing on methods rather than conclusions." 1-ER-11. This was also error. Rule 702(b) requires a court to consider whether the opinion is "based on sufficient facts or data," and Rule 702(d) asks

whether "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 dictates the correct standard for admitting expert evidence, not *Daubert*. *See, e.g., Kansas City S. Ry. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016) (noting Rule 702 "superseded *Daubert* many years ago"). Courts cannot focus solely on an expert's methodology without considering whether the expert's opinions are based on sufficient facts and data that would permit that methodology to be reliably applied.

### C. The district court ignored individual issues presented by used-car and leased-vehicle transactions.

Weir and Gaskin's damages analysis did not account for injuries allegedly suffered by used-car buyers and sellers. 1-ER-41-42. Nissan objected, but the district court held that the "parties or court can settle on an appropriate methodology." 1-ER-42; 8-ER-2117-18. This was error. Before certifying a class, a district court must resolve disputes about damages methodology to determine if they "undercut the model's reliability." *Olean*, 31 F.4th at 683.

An example illustrates why deferring resolution was error: consider a consumer who bought a new vehicle and drove it the "expected" life without the PSR breaking, then sold it to a second consumer. Was either consumer harmed? If so, which?

Two of the named Plaintiffs, Johnson and Seenarain, bought used vehicles. Seenarain also received an insurance payment after totaling her vehicle during this

litigation without ever disclosing the alleged PSR defect (indeed, the PSR remained intact). The *Beaty* court found that used-vehicle-transaction issues such as these precluded measurement of classwide damages in a PSR case involving Ford vehicles. 2021 WL 3109661, at *13.

Nissan also submitted unrebutted expert evidence detailing how a leased vehicle transaction differs from a purchase, and how Gaskin and Weir's damages model fails to account for these differences. 8-ER-1906-08. Nonetheless, the district court included leased vehicles in the certified classes.

For those and other reasons, the district court erred in accepting Plaintiffs' flawed damages model.

**D.    The district court abused its discretion in certifying equitable claims when Plaintiffs presented a damages model for legal remedies.**

Nissan moved at the pleading stage to dismiss Plaintiffs' equitable claims because Plaintiffs never alleged they lacked an adequate legal remedy. 10-ER-2465-67; 4-ER-706-08 (citing *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020) ("*Sonner I*")). The district court denied that argument as premature. 10-ER-2434; 4-ER-694. Nissan reasserted this argument at the class certification stage, pointing to Plaintiffs' proposed damages model as proof Plaintiffs believe they have an adequate legal remedy, as well as to the lack of any argument from Plaintiffs that such legal relief would be inadequate. 3-ER-584. The district court

again deferred ruling on that issue, saying it "will not be addressed now" and that Plaintiffs' remedies "will be clear at the end of the trial, not before." 1-ER-29.

This was error and an abuse of discretion. As this Circuit re-emphasized in *Sonner v. Premier Nutrition Corp.* ("*Sonner II*"), dismissal is fully appropriate where, as here, a plaintiff "could not show that she lacked an adequate remedy at law." 49 F.4th 1300, 1302 (9th Cir. 2022). Here, having punted this issue at the pleading stage, the district court was required to hold Plaintiffs to their burden of proving they could establish necessary elements of their equitable claims on a common basis. *Olean*, 31 F.4th at 666 ("In making the determinations necessary to find that the prerequisites of Rule 23(b)(3) are satisfied, the district court must proceed 'just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit.'"). Plaintiffs offer no damages model for equitable relief, and their damages model for legal damages should be dispositive of the issue. The district court's wait-and-see-what-happens-at-trial approach was an abuse of discretion.

## IV. The District Court Erred in Certifying Classes Overwhelmingly Composed of Uninjured Class Members.

The proposed class definitions include "[a]ll persons and entities residing in" each class state "who purchased or leased a Class Vehicle" in that state. 5AC, 4-ER-647-48. Plaintiffs assert that everyone in the class was similarly injured because

they all allegedly overpaid for their vehicles.[9] Plaintiffs' argument defies both logic and economic reality.

According to Plaintiffs, class members did not receive the benefit of their bargains because each bought a vehicle with a PSR that had some undefined "propensity" to break. As already explained, however, the vast majority of class members have never had—nor ever will have—a broken PSR. There is no demonstrated "propensity" to break. Less than 0.2% of Nissan's PSRs will break within the first 15 years of the vehicle's life, for any reason. 1-ER-4. The other 99.8% of Nissan PSRs are (and will remain) unaffected by the alleged defect. Awarding damages to class members of unaffected PSRs gives them a windfall: money to compensate them for a "defect" that never caused a problem. These individuals suffered no loss and received the benefit of their bargain

Nor can it be assumed Plaintiffs' "propensity" theory explains the remaining 0.2%. That figure, too, includes many uninjured class members. This is true because, as Nissan's uncontroverted evidence demonstrated, in most instances there is a known external cause for the vast majority of PSRs that break (such as a car wreck or vandalism) that has nothing to do with Plaintiffs' "propensity" theory. 6-ER-1359; 11-ER-2631; 6-ER-1365-66; 11-ER-2634-36; 1-ER-4.

---

[9] Aside from their unperformed, otherwise-flawed expert model, Plaintiffs never actually presented any evidence of a negative financial impact. In contrast, the evidence of Spry's resale of her Murano *is* in the record, and it illustrates *no* financial impact. 8-ER-2114; 6-ER-1335-37.

Uninjured class members lack Article III standing to seek damages. "Every class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Id.* (cleaned up). Plaintiffs must present evidence supporting standing at each stage of the litigation, including class certification, and they must demonstrate it for "each form of relief that they seek (for example, injunctive relief and damages)." *Id.* As the Supreme Court emphasized, the mere "risk" of harm is not a concrete injury for Article III purposes. *Id.* at 2210–11. But the mere risk of harm is all the overwhelming majority of class members have here.

While the Ninth Circuit has not set a threshold for an acceptable number of uninjured class members, other circuits have. The D.C. Circuit has held "5% to 6% constitutes the outer limits of a de minimis number" of uninjured class members. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624–25 (D.C. Cir. 2019) (cleaned up). The First Circuit has put the number at "around 10%." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 47 (1st Cir. 2018). A dissenting judge in the Ninth Circuit has opined one-third was too many, while pointing out that a hypothetical "80% uninjured" class would be an absurdity. *See Olean*, 31 F.4th at 685, 691 (Lee, J., dissenting) ("By definition, a class with 80% uninjured members cannot present a predominance of common issues because they have nothing in common with the remaining sliver of injured members."). Given the undisputed evidence that 99.85%

of units sold have never had their PSR break, the uninjured portion of the class here is even higher than that "absurd" 80% benchmark.

The district court never addressed Nissan's standing argument. Instead, it viewed the problem only through the lens of Rule 23 and state law. *See* 1-ER-40 (saying the question centers on "whether common issues predominate" under Rule 23, and saying Nissan "misunderstands the injury at the heart of this suit," that "for purposes of the [state] consumer protection statutes" the injury occurred when consumers "paid more than they would had the information been disclosed"). That was an abuse of discretion: standing is a threshold jurisdictional issue, and plaintiffs bear the burden of establishing it. *TransUnion*, 141 S. Ct. at 2208.

Plaintiffs will respond that, because of the alleged defect, all buyers were injured (and thus have standing) because they "overpaid" for their vehicle. But this is wrong for two reasons. First, many more class members indisputably received the full benefit of their bargain: they received a vehicle for which they never had to pay (and never will have to pay) a dime for any PSR break. Second, Plaintiffs offered no admissible evidence of overpayment. As explained above,[10] Plaintiffs' damages models here were incomplete: the district court granted certification on the *promise* of a damages model to be executed and tested in the future, not one that had actually been finalized or performed.

---

[10] *See supra*, Part III. Even when completed, the models will not show overpayment, only willingness to pay.

But the errors do not end there. Because it comprises mostly uninjured members, the proposed class not only has a fundamental Article III standing problem, it has Rule 23 typicality and commonality problems. Rule 23(a)(3) requires a class representative to prove his "claims or defenses … are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality requires not just that a class representative claims be typical, but also his or her injuries. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (cleaned up).

The district court never addressed Nissan's arguments that most of the class never suffered an injury, a fact rendering the named Plaintiffs atypical. Instead, the district court agreed with Plaintiffs and simply assumed the injuries were all the same because the PSRs were defective and the "harm under the consumer protection statutes is the *nondisclosure* of that issue." 1-ER-31. But for the vast majority of class members, the alleged nondisclosure did *not* cause any harm. The court simply assumed the nondisclosure *itself* was harm, but it had no basis for doing so.

Further, the presence of uninjured class members also defeats predominance. As this Circuit has held, the predominance requirement requires a "rigorous analysis" of "whether individualized questions, including those regarding class members' injury, will overwhelm common ones and render class certification

inappropriate under Rule 23(b)(3)." *Olean*, 31 F.4th at 669. Here, the district court's application of *Olean* was cursory. It correctly identified that the *en banc Olean* decision controls: "the question remains whether common issues predominate." 1-ER-40. But then it skipped any analysis.

The district court just assumed all class members overpaid, even though Plaintiffs offered no admissible evidence supporting this conclusion. But member-by-member inquiries will need to take center stage to ensure that only injured class members recover. At some point, each class member will need to prove that they (1) needed a repair at some point, (2) did not sell their vehicle or end their lease before the need for repair arose, (3) did not have a PSR break from some other cause, and (4) did not receive a PSR replacement from a Nissan dealership. *Olean* warned against litigation that raises "individualized questions regarding which members of the [class] had suffered an injury," because common issues do not predominate if there is a need for "individualized mini-trials to determine each class member's damage award." *Olean*, 31 F.4th at 681, 682 n.31. Where, as here, a defendant invokes and substantiates individualized issues that would preclude relief by "at least some class members," plaintiffs must establish—and the court must determine—"whether a class-member-by-class-member assessment of the individualized issue will be unnecessary or workable." *Van v. LLR, Inc.*, 61 F.4th 1053, 1068–69 (9th Cir. 2023) (reversing class certification where "retailer discounts left some class members uninjured," which summoned "the spectre of

class-member-by-class-member adjudication"; rejecting district court's determination that the number of affected class members was "de minimis").

Nor is this a case where Nissan "might attempt to pick off the occasional class member here or there through individualized rebuttal." *Olean*, 31 F.4th at 668. In *Olean*, a super-majority of class members suffered some injury. *Id.* at 680. Here, the opposite is true: *lack* of injury is the norm. The district court never addressed this distinction.

## V.   The District Court Erred in Expanding Plaintiffs' Substantive Rights— and Foreclosing Nissan's Substantive Defenses—in Violation of the Rules Enabling Act.

The Rules Enabling Act ("REA") forbids using the class-action procedure to expand or otherwise modify substantive rights. 28 U.S.C. § 2072(b) (the Federal Rules of Civil Procedure cannot be used to "abridge, enlarge or modify any substantive right"). Yet that is what the district court did. It expanded Plaintiffs' rights under the CLRA and limited Nissan's defenses to certify a class. The Supreme Court and this Circuit have warned against using certification in this way. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (a "class cannot be certified on the premise" that a defendant "will not be entitled to litigate its statutory defenses to individual claims" because doing so would violate the REA); *Wit v. United Behav. Health*, 58 F.4th 1080, 1094–95 (9th Cir. 2023) (to evaluate whether certification order violates the REA, court should "begin with the" statute, evaluate plaintiffs' substantive rights under it, and then evaluate whether plaintiffs or the

court are "us[ing] Rule 23 as a vehicle for enlarging or modifying their substantive rights"); *Olean*, 31 F.4th at 664–65 ("The Supreme Court has made clear that Rule 23 is consistent with the Rules Enabling Act and does not abridge, enlarge or modify any substantive right. Rule 23 does not change plaintiffs' separate entitlements to relief nor abridge defendants' rights and, instead, alters only how the claims are processed.") (cleaned up).

### A. The district court expanded Nissan's duty to disclose under the CLRA.

Johnson's CLRA claim is premised on the theory that Nissan has "a duty to alert potential customers to the existence of the [alleged] Defect at the point of sale as this fact would be material to the potential customer's purchasing decision" but instead chose "to intentionally conceal or, at best, omit the existence of the defect to consumers considering the purchase of a Nissan vehicle." 3-ER-624. This theory is essential for Johnson (the sole California representative) to prove causation, a necessary element of her claim. *See Wilens v. TD Waterhouse Grp., Inc.*, 120 Cal. App. 4th 746, 754 (2003). Therefore, Johnson must allege and prove specific facts showing Nissan could have disclosed information about the alleged defect to her at the time of sale. She has not done so.

Instead, the evidence shows she bought her Maxima used from CarMax. Johnson does not (and cannot) prove that CarMax is a dealer authorized by Nissan to sell its vehicles. Nor does (or could) she show that Nissan even sold the Maxima

to CarMax (which it did not), let alone with the intent of requiring CarMax to sell it to a California consumer. Indeed, the record shows CarMax bought the Maxima from a third party in Nevada before transferring it to its California location. 4–ER–758–59.

The CLRA does not support the liability Johnson seeks to impose; she cannot establish the facts necessary to show Nissan knew it had a duty to disclose facts to her when she bought her Maxima. California district courts routinely dismiss claims under similar circumstances, distinguishing them from purchases from authorized dealers of a defendant. *See, e.g., Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 967–68 (N.D. Cal. 2018) (dismissing omissions claims against Ford by plaintiff who bought from a non-Ford dealer); *Clark v. Am. Honda Motor Co.*, 528 F. Supp. 3d 1108, 1123–24 (C.D. Cal. 2021); *Hindsman v. GM LLC*, 2018 WL 2463113, at *13 (N.D. Cal. June 1, 2018). Nissan has no control over CarMax's interactions with its customers, and cannot control what disclosures CarMax makes. California law does not impose liability under such circumstances. *See Williams & Fickett v. County of Fresno*, 2 Cal. 5th 1258, 1274 (2017) ("[T]he law never requires impossibilities.") (quoting Cal. Civ. Code § 3531). Johnson cannot use Rule 23 to change that law.

Nonetheless, the district court changed the law to facilitate certification. In denying Nissan's Motion to Dismiss the Fourth Amended Complaint, it ruled that the focus in determining duty to disclose is on "what channels of information

customers depend on and whether the defendant could have taken action to disseminate information through those channels." 4-ER-694-95. But, the court changed its approach in the certification order, ruling "it is reasonable to infer … that used car dealers would disclose potential safety hazards when properly informed by Nissan." 1-ER-26. But that inference is not supported by any evidence, particularly where the record does not show what information Johnson relied on. Moreover, there is no evidence in the record of a potential safety hazard.

Further complicating the issue is that Plaintiffs have refused to describe the content of the alleged omission or specify where a satisfactory disclosure could or should have been made. *See.*, 2022 WL 4358096, at *7 ("[A] plaintiff asserting an omission-based claim must allege the information that the defendant allegedly omitted and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that the plaintiff relied on to make her purchase but that failed to include the allegedly omitted information."). Plaintiffs' failure is highlighted by the fact Plaintiffs themselves never read materials available to consumers, such as owners' manuals, before purchase, indicating they cannot establish where the unidentified disclosure would have been sufficient. This missing information should have been disclosed in the pleadings, to give Nissan fair notice of the basis of this suit. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (holding, in automotive case, that a plaintiff's "contention that his nondisclosure claims need

not be pleaded with particularity is unavailing"). It never was. And despite pleas from Nissan, the district court refused to require Plaintiffs to provide this information in discovery, and then failed to address the matter in its certification order, saying only that it had already rejected the argument at the pleading stage. 1-ER-26. Despite the fact that certification requires evidence, the district court required none on this issue from Plaintiffs.

## B. The district court wrongly allowed Ms. Johnson to assert a CLRA claim based on a used-car sale.

Johnson also should not have a CLRA claim because she was not the original buyer of her Maxima. CLRA liability cannot be predicated on conduct after the original sales transaction. *Durkee v. Ford Motor Co.*, 2014 WL 4352184, at *3 (N.D. Cal. Sept. 2, 2014); *see also Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 837 n.6 (2006). The original sale of Johnson's Maxima occurred outside California when an independently owned and operated Nissan dealership sold it to the original owner, who would be the "consumer" in the transaction with the Nissan dealership. Any damages related to that original sale are available only to the original purchaser under laws available in that state.

California has long recognized that only the original purchaser may bring an action for monetary restitution under the CLRA. *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 960 (2005); *see also Vega v. CarMax Auto Superstores Cal., LLC*, 2018 WL 3216347, at *1–3 (Cal. Ct. App. July 2, 2018); *Thayer v. Benjamin*

*Franklin Plumbing*, 2011 WL 5056277, at *5 (Cal. Ct. App. Oct. 25, 2011).

Even the CLRA's legislative history indicates the Legislature meant to limit the statute to the confines of a particular transaction. As originally introduced, Section 1770 would have declared that specified practices "undertaken by any person in the conduct of any trade or commerce are unlawful…." Assemb. B. 292, Reg. Sess. (Jan. 21, 1970) (emphasis added). The Legislature rejected it. A new version was proposed that narrowed the covered practices to those "undertaken by any person in the sale or lease of goods to any consumer." Amended Assemb. B. 292, Reg. Sess. (Cal. May 22, 1970) (emphasis added). This change supports the idea that a CLRA action can only be brought by a consumer against a defendant with which he or she actually transacted.[11] As explained by the legislation's author, the "transaction necessary is some agreement between a consumer and the defendant." James S. Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act*, 2 PAC. L.J. 1, 10 (1971) (cleaned up).[12]

---

[11] This argument is also supported by the statute's plain text. If the consumer is actually harmed by the practice in that transaction, the consumer can sue "that person…." Cal. Civ. Code § 1780(a).

[12] Mr. Reed describes himself as the legislation's "author," saying he "was involved in the preparation of all legislative drafts of the Act and participated in all conferences and hearings as it passed through the legislative process." James S. Reed, *Legislating for the Consumer: An Insider's Analysis of the Consumers Legal Remedies Act*, 2 PAC. L.J. 1, 1 (1971). Courts routinely use the views of the draftsman in construing legislation. *See Kosak v. United States*, 465 U.S. 848, 856–57 & n.13 (1984) (Marshall, J.) ("[I]t is significant that the apparent draftsman of the crucial portion" of the statute construed it in this manner, and "it seems to us senseless to ignore entirely the views of its draftsman.").

In *Schauer*, the court held that a woman whose husband bought an allegedly overvalued ring she obtained in a divorce settlement could not sue under the CLRA. 125 Cal. App. 4th at 955–56. The ex-husband could because he had purchased it, but "[p]laintiff's ownership ... was not acquired as a result of her own consumer transaction with defendant." *Id.* at 960; *see also Morris v. Farmers Ins. Exch.*, 2006 WL 3823522, at *1, *4–5 (Cal. Ct. App. Dec. 28, 2006).

*Morris* rejected attempts to limit *Schuaer* in the used-car context. *Id.* at *5–6. More recently, the Court of Appeal again embraced *Schauer. Vega*, 2018 WL 3216347, at *1–3. There, a plaintiff sued CarMax for misrepresenting and concealing facts about the condition of a Ford Mustang. *Id.* at *1–2. But that plaintiff did not buy the Mustang; his mother did. *Id.* The plaintiff tried to distinguish *Schauer* because he had accompanied his mother to the lot and made the decision to buy it. *Id.* at *4–5. But the Court of Appeal held this did not make him the "consumer," nor had he engaged in a "transaction" with the defendant. *Id.* at *8–9; *see also Thayer*, 2011 WL 5056277, at *5 (also applying *Schauer*; plaintiff who did not buy from defendants could not bring CLRA claim). Thus, the California Court of Appeal has repeatedly held a CLRA action can be brought only if there is some type of transaction between the plaintiff and the defendant.

Many Ninth Circuit district courts have reached results consistent with *Schauer. See Kas v. Mercedes-Benz USA, LLC*, 2012 WL 12886203, at *1–2 (C.D. Cal. Jan. 19, 2012); *Cirulli v. Hyundai Motor Co.*, 2009 WL 4288367, at *4 (C.D. Cal.

Nov. 9, 2009); *Green v. Canidae Corp.*, 2009 WL 9421226, at *4 (C.D. Cal. June 9, 2009); *Fulford v. Logitech, Inc.*, 2008 WL 4914416, at *1 (N.D. Cal. Nov. 14, 2008).

While other federal courts have interpreted the CLRA more broadly, those cases typically rely on a single federal decision that predated *Schauer*, without addressing the later state cases that limit liability to an actual transactional relationship, direct or indirect, as it relates to the original sale, between the parties. *See Chamberlan v. Ford Motor Co.*, 2003 WL 25751413 (N.D. Cal. Aug. 6, 2003). That is what the district court did here: citing *Chamberlan*, the district court said the "CLRA does not require a direct transaction between plaintiffs and defendants." 4–ER-723.

The district court's view errs in three independent ways. First, *Schauer* is the best evidence of California law, and "California courts would not" allow a claim like in this case where the plaintiffs "did not engage in any transaction" with the defendant. *Watkins v. MGA Ent., Inc.*, 550 F. Supp. 3d 815, 836–37 (N.D. Cal. 2021). Second, *Chamberlan* is distinguishable in that it permitted purchasers of used vehicles from Ford's authorized dealerships, allegedly acting as Ford's agents, to pursue a CLRA claim against Ford. Here, it is undisputed that CarMax has no relationship with Nissan and was not acting as an agent of Nissan. *Chamberlan* reasoned it would be sufficient if the deceptive acts prohibited by the CLRA occurred in connection with the original "transaction" with the original consumer because that original transaction "results in the sale" of the product to subsequent

consumers. *Chamberlan*, 2003 WL 25751413, at *1, *7–8. In other words, *Chamberlan* itself recognized that CLRA liability must be predicated on the original sale.[13] And third, the district court applied the wrong section of the statute in its original holding on this point.[14] In its order, it cited Cal. Civ. Code § 1780(a), but the relevant section is Cal. Civ. Code § 1770(a). 10-ER-2430. The former provides for the statute's damages; the latter proscribes "the unfair methods of competition and unfair or deceptive acts or practice" for purposes of the statute. *See* Cal. Civ. Code § 1770(a).

A federal court sitting in diversity must apply the best available evidence of state law; here, that is the state intermediate appellate decisions above. Further, *Erie* requires that to the extent state law is unclear, a federal court should err on the side of the construction that limits liability. *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023–24 (9th Cir. 2008) (holding that, under *Erie*, federal court was not free to expand state-law liability by broadly construing privity exceptions). It "is not free to engraft onto [the] state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits." *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975) (citations omitted). The Ninth Circuit has applied

---

[13] *Chamberlan*'s narrow exception is itself subject to reasonable debate.
[14] The district court's original holding was at an earlier stage of litigation. *See* 10-ER-2430.

this principle repeatedly. *See Del Webb Cmtys., Inc. v. Partington,* 652 F.3d 1145, 1154 (9th Cir. 2011); *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1203–04 (9th Cir. 2002).

Here, the district court ignored *Erie* and expanded the rights of the class under Rule 23 by allowing the class to be represented by a third-party purchaser with no cognizable CLRA claim.

## VI.   The District Court Erred in Certifying Unrepresented Classes.

The district court included in its classes three categories of putative class members that lack a class representative: purchasers and lessees of 2013 Infiniti JX[15] and 2014–2020 Infiniti QX60 vehicles; purchasers and lessees of Nissan Pathfinder and Rogue models; and lessees in general. *See* 1-ER-3.

Regarding Infiniti vehicles, they are a distinct make of car from Nissan vehicles.[16] The only named Plaintiff who had bought an Infiniti, Janelle Horne, voluntarily dismissed her claim when it came time to schedule her deposition. 9-ER-2299. Nissan opposed certification including Infiniti vehicles, but the district court overruled that objection:

> The plaintiffs have shown that the PSRs in the Infiniti models are 'substantially similar' to the PSRs in the named plaintiffs' vehicles, so can remain part of the suit. *Cooper v. Firestone Tire & Rubber Co.,* 945 F.2d 1103, 1105 (9th Cir. 1991). In particular, the plaintiffs' experts analyze the Infiniti PSRs along with the others, in one analysis, demonstrating their substantial similarity.

---

[15] The Infiniti JX was renamed the Infiniti QX60 after model year 2013.

[16] Infiniti and Nissan are separate divisions of Nissan North America.

1-ER–41.

As a threshold matter, *Cooper* is inapposite. It did not involve the similarity of products in a class action, nor did it involve standing or statutory requirements for when a named plaintiff can sue about related products. Rather, it centered on whether accidents involving the *same product* were similar enough for "a plaintiff … to introduce evidence of other accidents as direct proof of negligence, a design defect, or notice of the defect." *Cooper*, 945 F.2d at 1105. That rule has no bearing here.

This Circuit has not directly addressed whether and when a plaintiff has standing for products they did not purchase. *T.T. v. Supercell, Inc.*, 2023 WL 2562395, at *2 (N.D. Cal. Mar. 17, 2023) ("In the Ninth Circuit, there is no controlling authority on whether plaintiffs have standing for products they did not purchase.") (cleaned up). Most district courts have held that "a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar." *Id.* (cleaned up). But there is a split among the district courts, and some have created a brighter line, that "claims relating to products not purchased must be dismissed for lack of standing." *Bruno v. Burt's Bees, Inc.*, 2022 WL 17224716, at *2 (C.D. Cal. Aug. 25, 2022) (cleaned up) (collecting cases and identifying the split among district courts).

Regardless of which test this Circuit adopts, the district court's decision here was in error. For the products to be similar, they need to be physically similar *and* be subjected to similar legal claims. *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 890 (N.D. Cal. 2012) ("The majority of the courts that have carefully analyzed the question hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); *see also Quacchia v. DaimlerChrysler Corp.*, 122 Cal. App. 4th 1442, 1450–51 (2004) (certification properly denied for allegedly defective belt-buckle used in "17 different vehicles over 10 model years" based on evidence that "location, shielding, and installation" of the buckle affected whether it would accidentally release). The analysis does not somehow center on whether plaintiffs' experts were able to analyze all products in one fell swoop, which is what the district court held here. The district court cited no authority for the analysis resting on such an arbitrary criterion, and such a rule is not based in case law. It is also an unworkable rule: plaintiff-side experts in class litigation would inevitably try to shoehorn dissimilar products into one overbroad analysis if the district court's rule here stands.

The only evidence here is that the Infiniti vehicles *are* physically different, a fact that Plaintiffs' experts—and the district court—ignored. The Infiniti QX60 is physically larger than the Nissan models, and the PSR is set back further on it. *See* 8-ER-2004-07; 11-ER-2721. The PSR design is also different: it has a different

panel configuration and size from the other PSR designs. *Id.* All of this is to be expected: Infiniti is a different vehicle make than Nissan. Plaintiffs never offered evidence otherwise. And even Plaintiffs' damages expert, Gaskin, recognized the distinct evidentiary issues related to Infiniti vehicles, testifying that he probably could not propose a conjoint survey for Infiniti vehicles given distinct attributes of that market. 7-ER-1670.

In fact, Plaintiffs themselves appear to have recognized that they needed an Infiniti buyer to bring claims against that vehicle make. Infiniti vehicles were not included in the first three iterations of their complaint, only added when they added Ms. Horne. *See* 9-ER-2301. But she dismissed her case on February 5, 2021, and there is no other Infiniti purchaser. 9-ER-2299.

Any material differences between the products create not only the aforementioned standing problems, but also problems with adequacy and typicality under Rule 23. Even district courts that have allowed products-not-purchased to survive a standing challenge have said it would need to be reassessed as part of the class-certification inquiry. *Stotz v. Mophie Inc.*, 2017 WL 1106104, at *6 (C.D. Cal. Feb. 27, 2017) ("[W]hether Plaintiffs may be allowed to present claims on behalf of others in the class who have purchased similar, but not identical, products will therefore be determined on an assessment of typicality and adequacy of representation at the motion for class certification stage."). The district court

skipped this step, never even addressing typicality and adequacy for the vehicles for which it certified classes.

The problem is not just with the Infiniti vehicles: it exists with certain Nissan models too. Johnson and Seenarain bought Nissan Maximas, while Spry and Sullivan bought Muranos. There are no purchasers of Pathfinders or Rogues. Again, the uncontroverted evidence is that these models have significant physical differences. *See* 8-ER-2006-07. The law requires a level of likeness among the vehicles, not just the fact that they are both vehicles with PSRs. But the district court never examined the similarity—let alone "substantial similarity"—of the vehicles in question here, which presents another reason for reversal.

Finally, Nissan submitted unrebutted expert evidence from Dr. David Harless on how the automotive lease market is economically distinct from the new-vehicle market. 8-ER-1906-08. Plaintiffs included lessees in their proposed classes but never offered a class representative who leased their vehicle. This perhaps reflects the point Dr. Harless makes, namely that lessees know they were never financially harmed because they negotiated their buy-back price the same day they negotiated their purchase price. 8-ER-1907. The district court never addressed this argument, sweeping lessees in four states into the certified classes.

## CONCLUSION

For the many foregoing reasons, Nissan respectfully requests that the order certifying the classes be reversed.

Dated: June 14, 2023

Respectfully submitted,

By: /s/ *Amir Nassihi*

Amir Nassihi

Amir Nassihi
Andrew L. Chang
M. Kevin Underhill
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: 415.544.1900
Facsimile: 415.391.0281

Holly Pauling Smith
Christopher R. Wray
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: 816.474.6550
Facsimile: 816.421.5547

**Attorneys for Defendant–Appellant
Nissan North America, Inc.**

## STATEMENT OF RELATED CASES

There are currently no cases pending before this Court that are related to this action.

Dated: June 14, 2023

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: /s/ *Amir Nassihi*
    Amir Nassihi

Attorneys for Defendant–Appellant
Nissan North America, Inc.

# CERTIFICATE OF COMPLIANCE

I certify that:

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32–1, the attached brief is proportionately spaced, has a Bell MT typeface of 14 points, and contains 13,517 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(a)(5) and (6).

Dated: June 14, 2023

Respectfully submitted,
SHOOK, HARDY & BACON L.L.P.

By: */s/ Amir Nassihi*
    Amir Nassihi

Attorneys for Defendant–Appellant
Nissan North America, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 14, 2023.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

By: ___/s/__*Amir Nassihi*_____
　　　　Amir Nassihi